1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4     THE UNITED STATES OF AMERICA        )
                                          )
5                                         )
                                          )
6     vs.                                 )   CR No. 11-10415-NMG
                                          )
7                                         )
                                          )
      JAMES PRANGE, STEVEN BERMAN,        )
8     RICHARD KRANITZ, KAREN PERSON,      )
      AND JOHN C. JORDAN                  )
9

10

      BEFORE:  THE HONORABLE NATHANIEL M. GORTON
11

12
                         STATUS CONFERENCE
13

14

15
              John Joseph Moakley United States Courthouse
16                         Courtroom No. 4
                           One Courthouse Way
17                         Boston, MA 02210
                      Tuesday, December 18, 2012
18                            3:12 p.m.

19

20

21                   Cheryl Dahlstrom, RMR, CRR
                        Official Court Reporter
22        John Joseph Moakley United States Courthouse
                    One Courthouse Way, Room 3209
23                        Boston, MA 02210
             Mechanical Steno - Transcript by Computer

24

25

1    APPEARANCES:

2        OFFICE OF THE UNITED STATES ATTORNEY
         By:  Sarah E. Walters, AUSA, and
3             Vassili Thomadakis, AUSA
         One Courthouse Way
4        Boston, Massachusetts 02210
         On behalf of the Government.

5

         LAWSON & WEITZEN
6        By:  Scott P. Lopez, Esq.
         88 Black Falcon Avenue
7        Boston, Massachusetts 02210
         On behalf of the Defendant James Prange.

8

         FOLEY HOAG LLP
9        By:  Michael B. Keating, Esq.,
              Martin F. Murphy, Esq., and
10            Daniel N. Marx, Esq.
         155 Seaport Boulevard
11       Boston, Massachusetts 02210
         On behalf of the Defendant Steven Berman.

12

         FITZGERALD LAW FIRM, S.C.
13       By:  Michael J. Fitzgerald, Esq.
         526 E. Wisconsin Avenue
14       Milwaukee, Wisconsin 53202
         On behalf of the Defendant Richard Kranitz.

15

         DiMENTO & SULLIVAN
16       By:  Francis J. DiMento, Esq.
         Seven Faneuil Hall Marketplace
17       Boston, Massachusetts 02109
         On behalf of the Defendant Karen Person.

18

         Inga L. Parson, Esq.
19       Three Besson Street, No. 234
         Marblehead, Massachusetts 01945
20       On behalf of the Defendant John C. Jordan.

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  This is Criminal Action No. 11-10415, the

3     United States of America vs. James Prange, et al.  Will counsel

4     please identify themselves for the record.

5          MS. WALTERS:  Good afternoon, your Honor.  Sarah

6     Walters on behalf of the United States.

7          THE COURT:  Miss Walters.

8          MR. THOMADAKIS:  Good afternoon, your Honor.  Vassili

9     Thomadakis, also on behalf of the government.

03:12 10          THE COURT:  Mr. Thomadakis, good afternoon.

11          MR. KEATING:  Good afternoon, your Honor.  Michael

12     Keating on behalf of Steven Berman.

13          THE COURT:  Mr. Keeton (sic).

14          MR. MURPHY:  Martin Murphy, also on behalf of Mr.

15     Berman.

16          THE COURT:  Mr. Murphy.

17          MR. MARX:  Daniel Marx, also --

18          THE COURT:  And, Mr. Marx, good afternoon to you.

19          MR. DIMENTO:  Francis DiMento for Karen Person.

03:12 20          THE COURT:  Mr. DiMento.

21          MR. FITZGERALD:  Michael Fitzgerald, on behalf of Mr.

22     Kranitz.  Good afternoon.

23          THE COURT:  Mr. Fitzgerald.

24          MR. LOPEZ:  Good afternoon, your Honor.  Scott Lopez

25     on behalf of Mr. James Prange, who is in the courtroom.  With

1        the Court's permission, could he sit next to counsel?

2                THE COURT:  Yes, he may.

3                MR. LOPEZ:  Thank you.

4                THE COURT:  Mr. Lopez.

5                Then we have on the phone, I believe, Miss Parsons, is

6        that correct?

7                MS. PARSONS:  That's correct.  Good afternoon, your

8        Honor.  Inga Parsons, appointed counsel on behalf of Mr.

9        Jordan.

03:13 10                THE COURT:  Then we're all present.

11                This is a pretrial conference, but there are pending

12        some motions before the Court; namely, a motion by the

13        Defendant Berman for relief from misjoinder or, alternatively,

14        to sever the codefendants.  Perhaps I could start by asking Mr.

15        Keeton (sic):  What is the difference between relief from the

16        misjoinder and/or severance?  Aren't they the same?

17                MR. KEATING:  They probably are, your Honor.  We

18        actually have a motion pursuant to Rule 8(b) as well as Rule 14

19        as part of the same motions that we made, but essentially --

03:13 20                THE COURT:  Basically what you're looking for is

21        severance?

22                MR. KEATING:  That's what we're looking for.

23                THE COURT:  I have looked at the briefs, tried to

24        digest them.  I'm not sure if I have been able to yet.  But I

25        think I would start by asking the government:  Why is this

1    indictment brought as three separate conspiracies rather than

2    one?  In other words, I have an understanding about the

3    hub-and-the-spoke types of conspiracy, but you have brought

4    this Superseding Indictment, I believe --

5         MS. WALTERS:  Yes, your Honor.

6         THE COURT:  -- as three separate conspiracies.  Why?

7         MS. WALTERS:  We thought that was the most prudent

8    course of action, your Honor, in terms of the proof of

9    agreement honestly between each of what we called in our brief

03:14 10   essentially the executive defendants.  I think, actually -- Mr.

11   Thomadakis and I obviously thought about this quite extensively

12   pre-indictment and have talked about it since as well.  There's

13   certainly an argument that -- certainly with regard to the

14   Defendants Person and Berman, that they could have been -- that

15   the evidence suggested that they did, you know, enter into an

16   illegal agreement as well.

17        THE COURT:  At least as I understand the facts, you

18   have alleged that they knew about the other's fraudulent

19   conduct.  And perhaps, I suppose, it suggested that they were

03:15 20   encouraged by the fact that somebody else was doing it.

21        MS. WALTERS:  That's what the underlying facts are.

22   Both defendants are on recorded conversations referring to the

23   other's participation in this scheme.  So while, you know, it

24   may have been possible to charge it as sort of a

25   hub-and-a-spoke conspiracy, if you will, your Honor, we felt

1    the most prudent action, just when it came down to the counts,

2    was to charge each of the executive defendants with having

3    conspired with Prange and, in Mr. Berman's case, Mr. Kranitz'

4    case, with each other as well.

5           Now, obviously, as you can see from our brief, just

6    because they were charged in separate conspiracy counts doesn't

7    mean that they weren't -- that they weren't participating in

8    Mr. Prange's scheme, if you will, to introduce these executives

9    and broker these kickback transactions, if you will.  All of

03:16 10   the executive defendants were participating in that scheme, and

11   each conspiracy count charged shared the common plan.  There

12   were overlapping facts.  There will be substantial overlapping

13   evidence with regard to each --

14          THE COURT:  What importance, if any, does it have that

15   they took place in the same location and at a similar time?

16   Why is that relevant?

17          MS. WALTERS:  I think that's what -- in just reading

18   the case law that those are different factors that suggest --

19   certainly in Barbosa and Martinez, the First Circuit found

03:17 20   those facts very compelling because, again, I think it

21   suggested the -- it demonstrated why the evidence would be

22   overlapping, that, you know, in this instance, we're going to

23   have the same undercover agent testifying about the meetings he

24   had with Mr. Prange and each of the executive defendants.

25   We're going to be having the same cooperating witness most

1    likely testifying about how he, working with Mr. Prange,

2    arranged each of these meetings, you know, the same location;

3    it was the same video equipment.  These are factors that the

4    First Circuit looks at when determining whether these

5    transactions were, in fact, a series.

6         THE COURT:  The First Circuit doesn't have any case

7    law close to this.  You've cited to me several Second Circuit

8    cases.

9         MS. WALTERS:  Yup, your Honor.

03:18 10         THE COURT:  What's the closest First Circuit case that

11   you have?

12         MS. WALTERS:  I would say Martinez and Barbosa are the

13   two drug cases where no conspiracy was alleged, no overarching

14   conspiracy.  There were two -- in each case, there were two

15   separate drug transactions charged.  In each case, there were

16   some defendants that participated in both drug transactions.

17   In each case, there was one defendant, then one defendant that

18   participated in one of them and a second defendant that just

19   participated in the other.

03:18 20         The First Circuit found both of those were a series,

21   again, sort of looking at the entirety of the conduct, to

22   determine that they -- you know, these drug transactions were

23   really part of sort of a more overarching criminal enterprise

24   even though they weren't charged as a conspiracy, that when you

25   look at the overlapping participants, that it was -- that there

1   were a series of transactions because they were sort of part of

2   an overall scheme or efforts by several of the defendants to

3   sell drugs.  And the fact that certain defendants participated

4   in only one but not both of the transactions was really of no

5   moment in the analysis when sort of looking at the transactions

6   themselves and deciding is this part of a scheme.

7       THE COURT:  All right.  While you're on your feet and

8   before I ask Mr. Keeton (sic) to respond, let me see if I

9   understand the nature of the sting operation.  Do I understand

03:19 10   it that the undercover agent was pretending to be an employee

11   of the lender in this situation?  Certainly, the lender itself

12   or the executives of the lender were not intended to know that

13   their employee was going to get a 50 percent kickback.

14       MS. WALTERS:  That's exactly right.  And the

15   undercover agent made that clear to the defendants, that my --

16   and the lender, if you will, was purported to be a hedge fund,

17   which, of course, was fictitious.

18       THE COURT:  So the victims, if you will, or the

19   participants in this scheme, the businesspersons that were in

03:20 20   financial difficulty, knew that they were going to get 50 cents

21   on the dollar.  They were going to borrow a hundred thousand

22   and kick back 50, but they were still going to be obligated to

23   pay the hundred back to the lender, right?

24       MS. WALTERS:  They were obligated to sell $100,000

25   worth of their stock since this was a stock transaction, and

1        the lender was receiving stock in exchange for its investment.

2                THE COURT:  You mean 50 of stock for the 100 loan?

3                MS. WALTERS:  No.  They had to sell a hundred of

4        stock, and then they had to kick back 50 percent.

5                THE COURT:  I see.  So the lender ended up with stock?

6                MS. WALTERS:  Yes.

7                THE COURT:  Okay.

8                MS. WALTERS:  But, of course, these sales were being

9        made of stock -- the way the undercover agent would explain to

03:21 10       the executives, and the executives readily agreed to this, is

11       these are penny stocks that I didn't know anything about until

12       getting involved in this undercover operation.  But he would

13       agree to pay a much higher price than what the market price

14       was, in some of the situations making the statement to the

15       executives, I don't really care what I'm paying.  It's not my

16       money, making it clear that as long as his investors didn't

17       know what he was doing in terms of the kickback or really even

18       focused on the investment, that was his main concern.  So he

19       would overpay, if you will, these executives for the stock of

03:21 20       their companies.  So he's really defrauding this fictitious

21       hedge fund in two ways.

22                THE COURT:  His own employer?

23                MS. WALTERS:  His own employer.  Not investing in

24       companies that his employer otherwise would invest in.  I guess

25       three ways.  Paying more for the stock than it was worth.  And

1   then the third way is, you know, and all of this is all for the

2   enrichment of himself with really no benefit to his employer

3   and, in fact, harm preceding to his employer.

4          THE COURT:  And the involvement with the cooperating

5   witness, how did he --

6          MS. WALTERS:  He acted very much like Mr. Prange did:

7   as a bit of a broker or facilitator.  So he agreed to introduce

8   executives who he would believe -- who he and Prange

9   essentially believed would participate in this illegal

03:22 10   transaction to the --

11          THE COURT:  He had a prior acquaintance with Mr.

12   Prange?

13          MS. WALTERS:  He had -- my understanding is this --

14   the way he sort of met Mr. Prange was through another

15   acquaintance, but, yes, it was --

16          THE COURT:  But before the sting operation?

17          MS. WALTERS:  I don't know if he actually met Mr.

18   Prange specifically before the sting operation or not.

19          THE COURT:  Okay.

03:23 20          MS. WALTERS:  And if I just might, your Honor, I know

21   this isn't completely responsive.  Really the reason that this

22   was set up this way is it was important to the FBI and our

23   office in conducting this operation to make the victim the

24   fictitious fund, if you will, the fictitious employer, so that

25   while these executives were willing to engage in these illegal

1   transactions, they -- they wanted to catch people who were

2   willing to participate in these illegal transactions but

3   setting it up that our fictitious fund, unbeknownst to them

4   being fictitious, was the victim.  So that in conducting a

5   securities fraud operation of this import and this magnitude,

6   we were not harming the public anymore.  We were protecting it

7   and identifying people who were willing to engage in these type

8   of illegal transactions.

9          THE COURT:  Thank you, Miss Walters.  Mr. Keeton

03:24 10   (sic) --

11          MR. KEATING:  Yes, your Honor.

12          THE COURT:  -- I understand the nature of your motion.

13   Does the fact that your client and one of the other

14   codefendants were -- if not jointly part of this sting, at

15   least knew about the other's involvement in that sting, doesn't

16   that have an impact?

17          MR. KEATING:  I don't think it does, your Honor.  If I

18   could address it?

19          THE COURT:  Yes.

03:24 20          MR. KEATING:  I'll address that, but let me address it

21   in the context of responding to the question that you asked

22   Miss Walters.  I don't think you could have indicted either Mr.

23   Berman, Miss Person or Mr. Jordan in the same count.  There's

24   no allegation that there was any connection at all between

25   these three individuals other than the fact that --

1          THE COURT:  You say "three."  Person, Berman, and who?

2          MR. KEATING:  Jordan.

3          THE COURT:  Jordan as well?

4          MR. KEATING:  He's the fourth defendant here.  Kranitz

5   and Berman are together, and then there's Person and there's

6   Jordan.

7          If you look at the indictment, there's no suggestion

8   in the indictment that any of the three defendants, other than

9   Berman and Kranitz, Kranitz being Berman's lawyer, had any

03:25 10   connection with each other.  There's no suggestion that they

11   conspired together, that they were part of a joint venture

12   together.  And --

13          THE COURT:  There is apparently some evidence that

14   your client and Miss Person did, in fact, know about the

15   other's involvement before the scheme was hatched.

16          MR. KEATING:  Correct.

17          THE COURT:  Before it was consummated.

18          MR. KEATING:  Right.  But there was no suggestion in

19   the record -- and, your Honor, there has been extensive

03:25 20   videotaping and audio-taping so, fortunately, what was said by

21   everybody is a matter of record in this case.

22          Mr. Berman had never met Miss Person until the morning

23   of the meetings, that are separate meetings, that occurred with

24   the undercover agent.  They had apparently talked on the phone.

25   There was never a suggestion -- and I really have to emphasize

1   this.  There was never a suggestion by either Mr. Berman or

2   Miss Person that they worked together or that they were both in

3   some sort of joint plan to borrow funds from the -- what turned

4   out to be the undercover agent.

5        In fact, the tapes of Mr. Berman's conversation with

6   Mr. Kelly make it absolutely clear that he considered himself

7   completely separate from Miss Person.  I'm going to quote to

8   you a few lines from one of the conversations he had with the

9   FBI agent.  "Karen," is how he refers to her, "is completely

03:26 10   separate from us," meaning Berman and Kranitz and his China

11   company.  He said, "I didn't walk in here today thinking I'm

12   going to be aligned with Karen.  The fact that Karen is here is

13   nice, but it's not part of what I'm doing."

14        Then he is told by the FBI agent not to talk with

15   Karen about the transaction that the FBI agent is talking to

16   Mr. Berman about, and Mr. Berman agrees to do that.  There

17   was --

18        THE COURT:  This is the undercover agent?

19        MR. KEATING:  Yeah.  He says to him, I don't want you

03:27 20   to talk -- you know that Miss Person is here today.  She's also

21   trying to borrow funds for her company.  Berman says, Yes, I

22   understand that.  I'm trying to borrow funds for my company.

23   But there's no suggestion in any of the materials, the tapes,

24   that there was any plan or cooperation or whatever between Mr.

25   Berman and Miss Person.  They happened to know each other and

1    knew each other very, very slightly.

2         THE COURT:  Isn't the fact that they both know that

3    they're going to participate in a similar transaction in some

4    way supportive of the conspiracy itself -- of the two

5    conspiracies?

6         MR. KEATING:  Well, I think here's the problem:  They

7    both knew that they were going to -- or at least Mr. Berman

8    knew he was trying to borrow money from the FBI agent.  He

9    thought it was a legitimate transaction.  The government views

03:28 10   differently.  He knew Mr. -- Miss Person was also in town

11   because she was going to see the same person because they had

12   both been introduced to the FBI agent by Mr. Prange.

13        But there was absolutely no other connection, your

14   Honor, between Mr. Berman and Miss Person except they both had

15   small companies that they owned or at least were managing, and

16   both of them needed funds to keep those companies going.  But

17   there was no -- otherwise no connection, which is why I think

18   if you look at the --

19        THE COURT:  There was one connection, apparently:  Mr.

03:28 20   Prange.

21        MR. KEATING:  There was one connection:  Mr. Prange.

22   But this, I think, your Honor, brings us to what I suggest --

23   you ask about the First Circuit.  The case that I think is

24   closest to this case is the Webb case, your own decision, your

25   Honor, where you had, in that case, five defendants.  You had

1    one -- you had a series of similar acts by the defendants with

2    one person who was a defendant -- became a defendant in two

3    trials.  And you separated the defendant -- those five

4    defendants into two trials.  You separated them because you

5    concluded that just because there was an overlapping person --

6    this case, it was a Mr. Webb, like Mr. Prange -- and just

7    because the activities of the defendant were similar, that did

8    not satisfy Rule 8(b), which is exactly, I think, what we have

9    here.

03:29 10    In all of the cases that have spoken to this issue --

11    Barbosa, Martinez, Talavera, all the ones that the government

12    cites -- these are all cases where there was something more to

13    the relationships among the defendants or to the criminal

14    transactions than what appeared to be what is in this case.

15    In this case, the only possible connection between any

16    of the defendants, other than Mr. Kranitz and Mr. Berman, is

17    the fact that Mr. Berman knew that Miss Person was there to

18    borrow money, and Miss Person knew Mr. Berman was there to

19    borrow money, both in separate transactions.  But what's very

03:30 20    important, your Honor, is neither of them suggested to the

21    other that there was anything improper about borrowing money

22    from this fictitious FBI agent.  In other words, they didn't

23    get together and compare notes or any of that sort of stuff.

24    They went -- each one of them went separately.  Each one of

25    them had separate meetings with the FBI agent, as did Mr.

1    Jordan.  And there simply is not any evidence that there was

2    any joint enterprise or participation between the two of them

3    other than they knew they were both in town for the same

4    purpose, which was to borrow money.

5         So what I'm really concerned about is some suggestion

6    that Mr. Berman knew that what Miss Berman -- excuse me, Miss

7    Person was doing was some illegal act, and Miss Person knew

8    what Mr. Berman was doing was some illegal act.  Mr. Berman

9    didn't think it was an illegal act, what he was doing, and he

03:31 10   had no reason to think Miss Person did either.

11        And I think what is fundamentally missing here, which

12   is not -- which is present in all of the other cases, even

13   Martinez, even Barbosa, these are cases where these defendants

14   had some interactions.  It was a series of drug transactions

15   where one defendant introduced the other to the seller or

16   whatever.  They were not situations like we have here.

17        What we have here is a situation where you have three

18   separate transactions, one common defendant:  Mr. Prange.  But

19   the three separate -- three transactions are completely

03:31 20   separate from one another in terms of the knowledge and

21   participation of any of the three participants.

22        And, finally, on the motion under Rule 8(b), even the

23   government doesn't suggest that there was any relationship with

24   Mr. Jordan by anybody.  I don't think there's any suggestion

25   Mr. Berman knew who Mr. Jordan even was.  So he's completely

1   out of the loop.  But I worry that the fact that Mr. Berman

2   knew who Miss Person was and the fact that he knew she, too,

3   like him, was interested in borrowing money, he never met with

4   Miss Person and Mr. Prange together.  He never met with the FBI

5   agent with Miss Person together.  There was never any of that

6   kind of communication.

7          THE COURT:  All right.  Thank you, Mr. Keeton (sic).

8          Do any of the other defendants wish to add anything to

9   Mr. Keeton's (sic) arguments?  I'll start with Miss Parsons on

03:32 10   the phone.

11          MS. PARSONS:  No.  I think he ably indicated and

12   emphasized that Mr. Jordan had no knowledge of any of the other

13   individuals, only with Mr. Prange.

14          I would just ask one other thing, which is, that

15   during -- in terms of his expectation of legitimacy, during his

16   conversations with Prange and the fictitious hedge fund

17   operator, my client even said something to the effect, Where do

18   I send the 1099?  So we very much dispute that there was a

19   conspiracy and, in particular, that he was involved with any of

03:33 20   the other defendants.

21          THE COURT:  Thank you, Miss Parsons.

22          Mr. DiMento, do you wish to be heard?

23          MR. DiMENTO:  I don't think I can add much except to

24   note one thing, your Honor.  For all the record shows, far from

25   being conspirators in agreement with each other, that is -- or

1    trying to attain a common objective as between Person and

2    Berman, for all the record shows, they could have been in

3    competition, looking for the same money, and just the opposite

4    of co-conspirators or co-venturers.

5         THE COURT:  They could have been.  But what evidence

6    is there that it was?  There isn't any.

7         MR. DiMENTO:  There's no evidence that they were

8    together either, as Mr. Keating points out.  And I say,

9    furthermore, the evidence is open -- the speculation is equally

03:34 10   open that they were competitors.

11        THE COURT:  All right.  Mr. Fitzgerald.

12        MR. FITZGERALD:  We took no position on the motion,

13   Judge.  I would not want that to be construed as a tacit

14   agreement with the government's position.  Of the two proposals

15   currently before the Court, we certainly prefer and agree with

16   Mr. Berman's current position.

17        THE COURT:  All right.  Mr. Lopez.

18        MR. LOPEZ:  Your Honor, my only comment is I would ask

19   that Mr. Prange not be subjected to three trials.

03:34 20        THE COURT:  I understand that.  Yes.

21        MS. WALTERS:  Your Honor, could I just respond briefly

22   to a couple things?

23        THE COURT:  Yes, you may, Miss Walters.

24        MS. WALTERS:  Thank you.  The government doesn't think

25   Mr. Prange obviously should be subjected to three trials

 1    either.  And I think a big part of what goes into this -- and

 2    the First Circuit, again, in Barbosa and Martinez is very clear

 3    that this Court can and should consider the efficiencies of

 4    joint trial under the Rule 8(b) analysis.

 5          In this case, the tapes in which -- of the -- the

 6    audiotapes in which Mr. Prange is recorded speaking with an

 7    undercover agent, the cooperating witness, and all of the

 8    executive defendants, are going to be admissible in virtually

 9    all three of the trials that Mr. Berman is proposing.  They go

03:35 10   to showing Mr. Prange's understanding of the deal, his intent

 11   to defraud.  So we're talking about major duplication here.

 12         Something in preparing for this hearing, I actually

 13   hadn't focused on in drafting the opposition, is Count 13.

 14   It's a wire fraud charge as to Mr. Prange alone.  That wire

 15   fraud charge is based on a wire transfer from the undercover

 16   agent to Mr. Prange as payment for the referrals of Miss

 17   Person.

 18         THE COURT:  His 10 percent?

 19         MS. WALTERS:  His 10 percent, exactly.  It's a single

03:35 20   wire transfer for both Miss Person and Mr. Berman.  I don't

 21   know if we flip a coin to decide which trial that gets tried

 22   in, but just as a logistical matter, that's going to pose a

 23   problem in terms of evidence.  Your Honor, I think the First

 24   Circuit is clear that you can consider this.

 25         With regard to both Ms. Parsons' and Mr. DiMento's

1    argument of sort of Mr. Jordan had no idea and Mr. -- that

2    these were competitors, the undercover agent is on tape telling

3    Mr. Prange, I've got money to invest in these companies.  Mr.

4    Prange -- Mr. Prange was in a facilitator role.  Even if Mr.

5    Jordan isn't on tape specifically referring to Ms. Person and

6    Mr. Berman, as Ms. Person and Mr. Berman are caught on tape

7    referring to each other, he's there as a facilitator.  He's

8    alleged in the indictment to be in the business of introducing

9    companies to sources of funding.  The undercover agent does

03:37 10   tell Mr. Jordan at his meeting, I have the legitimate side of

11   my business, and then I have the other side of my business,

12   making reference to his -- and makes reference to the other

13   kickback transactions he's done.

14          I also think it's important for the Court to be aware

15   that when we're concerned about, you know, oh, Ms. Person or

16   Mr. Berman may have thought this was legitimate, obviously

17   that's something that's going to get flushed out at a trial.

18   All of these defendants were told that what they were paying

19   the undercover agent was a kickback.  That word was used.

03:37 20   "Kickback" was used.

21          So, you know, again, the defense counsel will make the

22   arguments that, you know, they thought that it was legitimate

23   to pay a kickback, and a jury will make those decisions.  But

24   the concerns about jury confusion here, I just don't think are

25   real because the jury is going to get to see exactly what was

1    said to each defendant and how each defendant responded.

2    They're going to see the words that were used.  You know, I

3    think that is an important -- that goes to the Rule 14 analysis

4    that the Court is going to be asked to engage in as well that

5    Mr. Berman raises.

6         But the concerns about prejudice, not an issue here

7    because it's all caught on tape.  The concerns about

8    admissibility of evidence, most of it is admissible.  Almost

9    all of the evidence against all of the defendants is admissible

03:38 10   as to Mr. Prange in almost every trial that Mr. Berman is

11   proposing here.  The First Circuit is clear that that can be

12   cured by limiting instructions.  I know this Court has found

13   that as well.  And so just --

14        THE COURT:  How do you distinguish this from my Webb

15   case?

16        MS. WALTERS:  I couldn't find the indictment, your

17   Honor.  I looked for it.  My reading of the decision in the

18   Webb case, which is consistent -- which was very consistent

19   with what I found in other circuits when confronted with drug

03:38 20   conspiracies, where you have a single participant in two

21   different drug conspiracies that may not overlap in time and

22   that's the only link.  A drug conspiracy just to distribute

23   cocaine is a sort of amorphous conspiracy that you can't get to

24   the granule level of.  Does it share a common plan?  Are there

25   -- how many overlapping participants are here?  Is it -- does

1    it span over the same length of time?  Is there significant

2    overlapping evidence?

3        So my -- my understanding of the Court's opinion --

4    obviously, you're the best one to understand it -- is that

5    those were distinct conspiracies.  Those were not a series of

6    conspiracies.  Those were not a series of transactions.  Those

7    were two completely unrelated transactions, unlike the

8    conspiracy charges that we have where you have a common plan to

9    defraud the same investment fund, to pay kickbacks to the same

03:40 10  undercover agent, to enrich Mr. Prange for making those

11    introductions.  So that was the common plan.  That was the

12    common scheme.

13        That's why I think the Second Circuit decision in

14    Feyrer is very instructive just because it's very similar facts

15    to this.  You have the overlapping participants.  You don't

16    just have one overlapping participant here.  You obviously have

17    one overlapping defendant, which is Mr. Prange, but you have

18    the undercover agent, who was also a participant.  You have a

19    cooperating witness, who was also a participant.  You have all

03:40 20  of these executive defendants doing the same things, creating

21    fake invoices to the same nominee company, again, defrauding

22    the same fund.

23        And you have it virtually overlapping in time.  You

24    have Mr. Berman and Mr. Person meeting the undercover agent, as

25    they both knew, on the same day.  You have a single payment

1    going back to Mr. Prange, paying him for the introductions.

2    And you have Mr. Prange showing up with Mr. Jordan just shortly

3    thereafter.  So that was my reading of the Court's Webb

4    decision, and I think that's why it's distinct here.

5         THE COURT:  All right.  Thank you.  Mr. Keeton (sic),

6    very briefly.

7         MR. KEATING:  I don't mean to take too much time.

8         THE COURT:  I called you "Keeton" and I apologize, but

9    I'm looking at him right behind you.

03:41 10         MR. KEATING:  That's quite a compliment.  I'll take

11    it.

12         Your Honor, a couple of quick points.  In the Webb

13    case, actually, the events did take place contemporaneous with

14    each other.  It was all in January of 1992.  So not unlike this

15    case, the Webb case stood for the proposition that even if

16    these things take place in time and location together that

17    there's a -- that that's not a reason to distinguish it from

18    this case.

19         But I'd like to pick up on the comment that was made

03:41 20    by the government about a common plan.  There is no suggestion

21    -- there cannot be any suggestion in the evidence in this case

22    that there was any common plan amongst the defendants to

23    defraud the hedge fund of money by giving money to Mr. Prange.

24    If each of them did that separately, they did it all

25    separately.  There was never any suggestion that they had a

1   common plan.  And in that context, I draw your Honor's

2   attention specifically to the Feyrer case, which was referred

3   to by the government.

4        THE COURT:  The Second Circuit Feyrer case?

5        MR. KEATING:  Yes, your Honor.  That was the one in

6   which there was a plan in which stockbrokers would be bribed to

7   sell a stock in companies.  There was a common plan in that

8   case, (a), because the defendants met together in Las Vegas and

9   hatched the plan and decided how all of the defendants would

03:42 10   profit by paying off the stockbrokers to sell the stock.  And

11   every defendant in that case was aware of the fraud, not the

12   transaction but the fraud that was committed by the other

13   defendants, including themselves.

14        And I think that's what's missing in this case.  There

15   was no common plan amongst these defendants.  There was no

16   meeting ahead of time to say, Let's get together with Prange,

17   and let's get that money from the hedge fund.  It was all done

18   separately.

19        And, lastly, I would say, if this is the government's

03:43 20   position, why isn't it in the indictment?  Because the

21   indictment is the document that 8(b) refers to as --

22        THE COURT:  Why isn't what in the indictment?

23        MR. KEATING:  Why isn't the allegation of Person and

24   Berman, if there is anything to it, which I don't think there

25   is -- why isn't that in the indictment?  Why are we waiting now

1    to get this after-the-fact justification for the joinder?  I

2    think it's not in the indictment because I don't think it would

3    bear being in the indictment because there is simply no

4    evidence of such a joint plan.

5          THE COURT:  All right.  Thank you, Mr. Keating.

6          MR. LOPEZ:  Your Honor, could I just say one thing?

7    Because I didn't want to seem flip.  By saying that I don't

8    want Mr. Prange subjected to three trials, I don't want to give

9    the impression that I don't believe Mr. Berman's position lacks

03:44 10    merit.  I'm simply suggesting that, to the extent the Court

11    does sever, I would ask the Court to separate the trials in a

12    sufficient manner so that the government can have an

13    opportunity to review whether or not they would want to go

14    forward on additional cases against Mr. Prange after the result

15    of the first trial.

16          THE COURT:  All right.  I understand.

17          I'm going to take this matter under advisement.  I

18    think it is a serious argument and one that bears careful

19    reflection.  But I am also going to set a trial date down.  I

03:44 20    will ask Miss Walters, first, to give me an estimate of the

21    length of trial if I do not sever; and then if I do sever and

22    we try -- and I would expect it would be the Berman-Kranitz duo

23    first.  How long will either of those trials take?

24          MS. WALTERS:  Could I actually defer to Mr. Thomadakis

25    because he's focused on that?

1          THE COURT:  You may.

2          MR. THOMADAKIS:  I don't know if I've been focused on

3     it, but I am now.  I think if all defendants are tried

4     together, I would estimate a trial would take seven to eight

5     trial days.  If just the Berman --

6          THE COURT:  How many witnesses will the government

7     have if they're all tried together, approximately?  I don't

8     need an exact.

9          MR. THOMADAKIS:  Five to seven or eight.

03:45 10        THE COURT:  Okay.

11         MR. THOMADAKIS:  But there's a lot of tape, is the

12    issue.  It's not the amount of witnesses that would be driving

13    the time.

14         On a shorter trial, I think we could -- the

15    Berman-Kranitz-Prange, at least some subset of Prange, group,

16    we could try in three to four days.

17         THE COURT:  All right.  Thank you.

18         Any of the defendants have reason to disagree with

19    that time estimate?

03:46 20        MR. KEATING:  We don't, your Honor.

21         THE COURT:  Hearing none, I have a particularly heavy

22    trial schedule in the early months of next year.  But before I

23    came on the bench, I did determine that I have availability

24    April 29th, Monday, April 29th, for up to two weeks.  But

25    that's about the only time between now and then that I have a

1   window of more than a week.  And it sounds like, if this case

2   were to be tried together, it would take definitely more than

3   one week.  Maybe the separate trial wouldn't.  But that's the

4   day I've got.  Any problem, Mr. Thomadakis?

5         MR. THOMADAKIS:  Yes, your Honor.  We have a trial

6   scheduled, Miss Walters and I both, on May 6th in another one

7   of these cases arising out of the sting operation.  I realize

8   that the Court's trial schedule is heavy.  And we have a

9   variety of conflicts.  Miss Walters is also in trial in June.

03:47 10   We were -- coming in, we were going to propose, without having

11   asked whether this works for the defendants, but from our

12   perspective, we were going to propose July 15th if April

13   doesn't work.  But we also realize that there are a lot of

14   people here.

15         THE COURT:  That's too far out for me.  Let me ask my

16   deputy something here.

17   (Discussion held off the record.)

18         THE COURT:  How about April 22nd, the week before?

19   Tough.  You've got to go back to back, Mr. Thomadakis.

03:48 20         MR. THOMADAKIS:  We could physically do it.

21         THE COURT:  That's when it's got to be:  Monday, the

22   22nd, April 22nd.  If it goes two weeks, we're done by the 6th

23   of May, whenever.  Mr. Lopez?

24         MR. LOPEZ:  That's fine with us, your Honor.

25         MR. KEATING:  Fine with us, your Honor.

1          THE COURT:  Mr. DiMento?

2          MR. DiMENTO:  Yes.

3          THE COURT:  Miss Parsons?

4          MS. PARSONS:  I'm available, your Honor.

5          THE COURT:  Is it Mr. Fitzgerald?

6          MR. FITZGERALD:  It is.  I have a trial starting on

7    the 29th in state court in Wisconsin of a case involving

8    several Milwaukee police officers and criminal charges arising

9    out of a lengthy John Doe investigation, which is our state

03:48 10   court equivalent of a grand jury.  So I'll note that for the

11   record.  If this trial -- I'd be in a back-to-back situation;

12   and if this trial went longer than five trial days, I'd have a

13   serious conflict.

14         THE COURT:  Well, okay.

15         MR. FITZGERALD:  I'll see if I can work something out.

16   If that day is going to stay firm, I'd appreciate knowing that

17   as soon as possible.  I'll try to work something out for that.

18         THE COURT:  It's going to be firm as far as this

19   session is concerned.  I am going to consider the pending

03:49 20   motions carefully, but I'm going to decide it relatively

21   quickly.  So you will know one way or the other whether all of

22   you are going or just Mr. Keating's client, and I guess it

23   would be -- yeah, Mr. Fitzgerald's as well.

24         MR. FITZGERALD:  Correct.

25         THE COURT:  Then backing up from the 22nd of April, if

1    there are to be any in limine motions, I would like them no

2    later than the 1st of April, responses by the 8th.  That's two

3    weeks before trial.  Two weeks before trial, both -- all

4    parties' proposed voir dire questions for the jury panel and

5    your list of witnesses and exhibits.  Oppositions to witnesses

6    and exhibits will be due one week before trial, on the 15th.

7    Also on the 15th, your first effort at instructions to the

8    jury, which I, of course, allow you to supplement during the

9    course of trial, but I want your first effort by the 15th.  I

03:50 10   think that's all.  Maybe a verdict form by the 15th as well, a

11   proposed verdict form.  I believe those are the only matters --

12   oppositions to in limine motions was the week after they were

13   filed, right?  Two weeks ahead of trial.  Anything else that

14   counsel can think of that I haven't?

15        Then we do need, obviously, a motion to exclude all

16   time in the interests of justice under the Speedy Trial Act.  I

17   take it that motion will be filed by the government and joined

18   in by all defendants; am I correct, counsel?

19        MR. LOPEZ:  Yes, your Honor.

03:51 20        MS. PARSONS:  Correct, your Honor.

21        THE COURT:  Anything else that needs to come to my

22   attention today?

23        MR. THOMADAKIS:  No, your Honor.

24        THE COURT:  Yes.  Thank you.  We're adjourned.

25   (Whereupon, at 3:51 p.m. the hearing concluded.)

1                        C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom             _____

13     Cheryl Dahlstrom, RMR, CRR        Dated

14     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25