1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,          )
                                         )
5                      Plaintiff,        )  Criminal Action
                                         )
6                                        )  No. 11-10415-NMG
      vs.                                )
7                                        )
      JAMES PRANGE,                      )
8                      Defendant.        )

9

10    BEFORE:  THE HONORABLE NATHANIEL M. GORTON

11
                          RE-SENTENCING
12

13

14
             John Joseph Moakley United States Courthouse
15                       Courtroom No. 4
                        One Courthouse Way
16                       Boston, MA 02210

17
                        January 13, 2015
18                        3:05 p.m.

19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24     John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3204
25                   Boston, MA 02210
                  E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by SARAH E. WALTERS, ASSISTANT UNITED STATES ATTORNEY, and STEPHEN E. FRANK, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts  02110;

For the Defendant:

    Allen-Fuller, PA, by STEVEN N. FULLER, ESQ., 40 Stark Street, Manchester, New Hampshire 03101.

ALSO PRESENT:

Jennifer Broquist, Probation

PROCEEDINGS

THE CLERK:  All rise.  Thank you.  You may be seated.
This is Criminal Action Number 11-10415, United States of
America vs. James Prange.  Would counsel please identify
themselves for the record.

MS. WALTERS:  Good afternoon, your Honor,
Sarah Walters and Steve Frank on behalf of the United States.

THE COURT:  Ms. Walters and Mr. Frank, good afternoon.

MR. FULLER:  Good afternoon, your Honor, Steve Fuller
for Mr. Prange.

THE COURT:  Mr. Fuller, and we have Ms. Broquist here
from probation.  Good afternoon to her.  We also have
Mr. Prange, who is present by video conference I believe from
the Bureau of Prisons facility in Minnesota.  Good afternoon,
Mr. Prange.

THE DEFENDANT:  Good afternoon, your Honor.

THE COURT:  Can you hear and see us all?

THE DEFENDANT:  Yes, I can.

THE COURT:  Thank you.  We are here on the
re-sentencing of Mr. Prange following the decision of the
First Circuit Court of Appeals which affirmed the guilty
finding but remanded the case for re-sentencing, specifically
with respect to valuation of the so-called micro cap stock
companies because that had a bearing on the determination of
the loss which in turn had a bearing on the appropriate

1    guideline range.

2         I have received from counsel the government's

3    supplemental sentencing memorandum regarding loss attributable

4    to the Defendant Prange, the defendant's supplemental

5    sentencing memorandum on re-sentencing and the government's

6    reply to the defendant's supplemental sentencing memorandum.

7         I have also received motion of the defendants or

8    actually a joint motion filed on behalf of both

9    Defendant Prange and his co-defendant Jordan, a joint

03:08PM 10   motion to strike the affidavit of Thomas Carocci in support

11   of the government's supplemental sentencing memorandum and

12   the government's opposition to that joint motion.

13        So before we start, I will say so that we can proceed

14   that pending before the Court is the defendant's motion to

15   strike the affidavit of Mr. Carocci in support of the

16   government's supplemental sentencing memorandum.

17        It is Docket Number 378, and for the reasons that

18   follow that defendant's motion will be denied.  Defendants

19   contend that Mr. Carocci is not qualified to offer an expert

03:09PM 20   opinion on securities valuation, the Court disagrees and

21   concludes that Mr. Carocci's significant professional and

22   education background in finance and securities is sufficient

23   for him to state his opinion.

24        Moreover, at the trial, defense counsel cross-examined

25   Mr. Carocci to elicit his opinion on stock valuation.  His

1    testimony was allowed over an objection by the government and

2    concluded with defense counsel stating, "He's an expert, your

3    Honor."   So at least insofar as that motion was made, it is

4    denied.

5          Do you wish to address that, Mr. Fuller?

6          MR. FULLER:   Yes, your Honor, just on that specific

7    issue.   The quote that the government has in its memo from

8    which you just quoted, it ends with Ms. Parsons saying, "He's

9    an expert, your Honor."  You went on, your Honor, in the very

03:10PM 10   next sentence on the trial transcript at page 5-25 to say that

11   you weren't even sure he was an expert on this issue --

12          THE COURT:  All right.

13          MR. FULLER:  -- when it came to valuation.

14          THE COURT:  Fair enough, Mr. Fuller.  I did, in fact,

15   say that, but having considered the matter further, I do

16   believe he's entitled to file an affidavit as an expert, and I

17   will take his offer as an opinion along with the one that you

18   have offered on behalf of the defendant.

19          MR. FULLER:   Thank you, your Honor.

03:10PM 20          THE COURT:  All right.  So that means that the issue

21   of what they have concluded, and, of course, they are opposite

22   from one another, is before the Court.

23          As I say, I have read, received and read, the

24   memoranda that have been filed on behalf of the government to

25   supplement its sentencing memorandum regarding the loss

1        attributable to Mr. Prange, the defendant's response which, of

2        course, includes the affidavit of the defendant's expert,

3        Mr. Watts, and the government's reply to the defendant's

4        supplemental memorandum.

5               I guess the original government's sentencing

6        memorandum also included the statement of Mr. Carocci, so I

7        will hear oral argument with respect to the valuation of the

8        micro cap stock to the extent that you wish to supplement your

9        written offerings in that regard.

03:12PM 10               Will it be Ms. Walters for the government?

11               MS. WALTERS:  Yes, your Honor.  Thank you.  We view

12        the real issue before the Court at this time is whether the

13        Court has sufficient evidence before it to make the finding by

14        a preponderance of the evidence that the stock in Vida Life,

15        SBCO and China Wi-Max that was a part of these fraudulent

16        transactions is less in value than $25,000, and the reason for

17        that is that the entire of the funding that the FBI sent to

18        each of the defendants recruited by Mr. Prange was a total of

19        $95,000.  The guideline range at issue here is one between

03:12PM 20        70,000 and 120,000.

21               So as long as the Court is satisfied that the

22        government's -- that the evidence before it, you know, shows

23        that the stock value was less than $25,000, the Court can

24        reinstate the, you know, I guess find again the same guideline

25        range that it found previously.

1          Also, obviously the Court has a benefit that the

2     defendant's expert did not, which is that the Court sat through

3     the trial, heard all of the evidence, is entitled to rely on

4     that as well as the affidavits, and in sitting through the

5     trial, and as the jury's convictions of the defendants

6     necessarily found, these were wholly fraudulent transactions.

7          The affidavit, which the government's affidavit

8     submitted by Thomas Carocci takes a look at the value of the

9     actual shares that were traded in these companies.  It employs

03:13PM 10     a very reasonable and appropriate methodology.  He acknowledges

11     that it's very difficult to estimate the value and acknowledges

12     that he's looking at the value of the shares for free trading

13     shares, which necessarily have a greater value than the

14     restricted shares that were in issue here and lays out a basis

15     explaining to the Court why restricted shares by the sheer

16     nature of the fact that they cannot be sold freely.

17          There's restrictions that must be satisfied before

18     they can be sold necessarily are less valuable and concludes at

19     the end after an analysis that I know the Court is aware of, I

03:14PM 20     don't need to bore the Court with the details of it, but that

21     at most, the total of the shares of Vida Life, SBCO and

22     China Wi-Max that were sold to the FBI have a value of $6,000

23     or less, so based on that affidavit, there's a preponderance of

24     the evidence that the guideline with the adjustment of 8 for

25     loss applies.

1        With regard to the defendant's affidavit, your Honor,

2    and the methodology that they propose, there are really three

3    major problems with it, which we address in our papers and I'll

4    just touch on briefly.

5        One, the defendant's expert puts great value on the

6    negotiated price here.  The price was a negotiation between a

7    corrupt hedge fund manager and executives and corrupt

8    executives introduced by Mr. Prange, and as we quoted in our

9    briefing, as was made explicit, they were making up a price,

10    they were inflating the price.

11        The whole point of this transaction was not a

12    legitimate stock transaction where the corrupt hedge fund

13    manager was trying to get value for his fund, it was a

14    transaction where he was trying to get money into his pockets,

15    so the experts, their experts' reliance on the negotiated price

16    of this wholly fraudulent transaction doesn't make sense.

17        Second, the expert asks the Court to consider the fact

18    that the correct hedge fund manager had proposed making an

19    investment or sending money to the companies introduced by

03:16PM 20    Mr. Prange, and he talks about the fact that if in fact this

21    money had been invested as promised, the government, I'm sorry,

22    the executives could have really grown their companies which

23    would have increased the value of the share price.

24        Again, this might be theoretically appropriate but not

25    based on the evidence at trial.  The government offered

1    specific evidence at trial that when the FBI sent money to

2    Mr. Jordan for investment, he used it to pay himself and pay

3    off his own credit cards.

4         Similar evidence was provided with regard to money

5    that was sent to Mr. Berman and Ms. Person, which was allegedly

6    directed, supposed to be invested in their companies, and,

7    again, as we cited in our brief, the undercover agent or the

8    corrupt hedge fund manager told these executives I don't care

9    what you do with the money.

03:17PM 10         This wasn't about an investment, again, this was a

11    fraudulent transaction about stealing money from a fund and

12    putting it into the pockets of the corrupt fund manager and

13    these executives, so, again, pretending that this investment

14    would have really somehow increased the value of the stock in

15    these companies doesn't mesh with reality, your Honor, and the

16    evidence at trial.

17         And, lastly, again, the sort of reliance on the fact

18    that there would have been some measure of investment, 50

19    percent of this money would have been invested in the companies

03:17PM 20    allegedly is a little bit circular.

21         Again, the defendant's expert, and in their sentencing

22    memo, they'd like the Court to consider the fact that really

23    this was not a total loss, the only loss that could possibly

24    have befell the fund would be the amount that was being kicked

25    back, the 50 percent, and they make reference to the fact,

1    again, that these companies were expecting up to

2    $5 million in funding.

3              If the Court were to agree with that measure of loss,

4    the necessary conclusion is that for each of the companies

5    Mr. Prange introduced, he was intending a $2.5 million loss to

6    the fund, which would necessarily mean a $7 million, a more

7    than $7 million or a 20 point increase under the guidelines.

8              As we make clear in our reply brief and when we making

9    our sentencing arguments to the Court the first time around, we

03:18PM 10   believe the actual amount of money that was sent to the

11   executives is the proper loss figure at this point.

12             THE COURT:  That's the 95,000?

13             MS. WALTERS:  That's the 95,000.  That's the part your

14   Honor already found, but, again, I think this sort of shows why

15   the defendant's logic doesn't work here.  This wasn't a real

16   transaction.  The $5 million was entirely prospective, so,

17   again, if you take their methodology and their analysis to its

18   logical conclusion, you don't end up at a smaller loss, you end

19   up at a much greater one.

03:19PM 20             Nothing further, your Honor.

21             THE COURT:  Thank you.  Mr. Fuller.

22             MR. FULLER:  Yes, your Honor.  How are you?  Let me

23   take a couple of these in reverse order.  With respect to the

24   concept that it's not the kickback, it's the $2.5 million, the

25   $2.5 million is relevant only for one purpose, and that's to

1    show that when valuing a company on a private placement

2    transaction like this, you don't look at what the trading price

3    is compared to what it will be in the future or based on future

4    events when the investment is not made.

5         What we know what the facts were at trial is that

6    Mr. Prange, as someone that introduced these company executives

7    to this illegal funding scheme, he did not know nor did any of

8    the executives know that this was, in fact, a fraudulent

9    transaction or a scheme, they thought this was a legitimate

03:20PM 10   hedge fund, a legitimate hedge fund manager who was corrupt and

11   was ripping off 50 percent of the money.

12        That was really the government's case, and they went

13   ahead with this transaction, and they've now been sentenced,

14   they've been found guilty, and they're in jail, but when you

15   look at for purposes of evaluation on a micro cap stock, as the

16   First Circuit made clear, just because it's restricted stock

17   doesn't mean there's a discount to it.

18        What was negotiated here was a price, and you'll

19   recall from the Jordan tapes, he actually negotiated the price

03:20PM 20   and tried to get a higher price, and there was a whole debate

21   about whether or not he should be pushing for a higher price,

22   but what these people knew at the time was that 50 percent of

23   whatever was being invested was going back to the hedge fund

24   manager and would not benefit the investors.

25        That is what the reasonably foreseeable loss of

1 | someone that doesn't know that this hedge fund is fake and this

2 | hedge fund manager is fake.  All they can reasonably know is

3 | that he is corrupt, and his corruption, as what's pitched in at

4 | trial is 50 percent of the money is going back to me as a fee,

5 | I'm getting it, and my hedge fund manager doesn't know, so the

6 | most valuable exercise one can go through in terms of valuing

7 | this stock from the subjective perspective of what the

8 | defendants saw, particularly Mr. Prange, who was the

9 | introducer.  He wasn't even the person negotiating the prices,

03:21PM 10 | he just knows this transaction is going to take place and that

11 | there's going to be a 50 percent kickback.

12 | It is a reasonable and foreseeable conclusion that the

13 | value of the stock, this legitimate hedge fund, is assessing to

14 | the company is 50 percent less than what's being invested, and

15 | that number comes out 47,500, and that affects the guidelines

16 | by effectively a two-point level decrease, and it reduces the

17 | sentencing from 18 to 24 months rather than the 24 to 30 months

18 | that he was sentenced under, and that's giving the two-point

19 | enhancement that you asked for, that you imposed.

03:22PM 20 | THE COURT:  You mean for the management?

21 | MR. FULLER:  Manager.  That concludes that.  What we

22 | respectfully submit is that the guideline calculation here is

23 | 18 to 24 months.

24 | THE COURT:  All right.  Thank you.

25 | MR. FULLER:  Thank you.

1          THE COURT:  You may respond to counsel's argument.

2          MS. WALTERS:  I don't think so, your Honor, thank you.

3          THE COURT:  Okay.  Well, the Court has considered this

4    matter before we got out here, and I believe that the Court

5    agrees with the conclusions of Mr. Carocci that the restricted

6    stock of the three subject micro cap companies had relatively

7    de minimis value, let us say less than $6,000 because, first,

8    such stock was worth less than the unrestricted shares of the

9    same stock as far as he argues, and the Court agrees.

03:23PM 10          Second, the unrestricted stocks of those companies

11   during the relevant time period had little or no market value

12   to begin with.  The Court relies on the evidence at the trial

13   that the transactions between the defendants and the undercover

14   agent were wholly fraudulent and that the defendants knew that.

15   The price paid by the fictitious head fund for the stocks in

16   question had no bearing on their actual value.

17          Everyone involved knew that the undercover agent never

18   intended to do and did not ever do due diligence on the

19   companies, that he didn't care how the stocks performed and

03:24PM 20   that he didn't care what the defendants did with the money

21   invested.

22          The Court also credits the government's argument that

23   the defendants are actually fortunate that the loss, as

24   previously calculated in the defendant's pre-sentence report,

25   are only $95,000 in this particular defendant's case because if

1    the Court were to agree with the defendant's contention that

2    they expect it to receive the full $2.5 million investment

3    discussed instead of just the first tranche, the loss

4    attributed to the defendants for sentencing purposes would have

5    been much greater resulting in a higher, not lower, total

6    offense level, therefore, the Court finds that the value of the

7    micro cap stocks, all three companies concluded together was

8    $6,000 or less and that, therefore, the total loss that one

9    will need to compute to find the appropriate guideline range

03:25PM 10    would have been somewhere in excess of $89,000, that being

11    $6,000 less than the $95,000 that was to pass hands in any

12    event, so that means that there will be no change in the

13    determination of the offense level.

14         I don't know what counsel believed the Court's

15    obligations are with respect to the reimposition of sentence or

16    whether I need to go through and determine once again under the

17    guidelines what the base offense level is and so forth.

18         Does the government have a position on that,

19    Ms. Walters?

03:26PM 20         MS. WALTERS:  Your Honor, thank you.  I was just

21    conferring with defense counsel.  There's no dispute as to the

22    role enhancement or the base offense level, which is the only

23    other adjustments applied.  I think as a practical matter, you

24    should probably reimpose the sentence based on your guideline

25    calculation.

1        THE COURT:  All right.  I will just for the record

2   suggest that the guideline that we are operating under is

3   2B1.1(a), that there has been no change since the 2012

4   guideline, which is the one we used at the time of sentence; is

5   that right?

6        MS. WALTERS:  I believe so, your Honor, that's

7   correct.

8        THE COURT:  That under that section, the base offense

9   level is found to be 7, but under subsection (b)(1)(e) of the

03:27PM 10  same guideline, an 8-level increase is warranted because the

11  loss here is greater than $70,000 but less than $120,000 and

12  that under Guideline Section 3B1.1(c), this defendant, it is

13  warranted that a two-level increase be awarded because of the

14  manager role in the criminal activity that he played.

15       That ends up with a total offense level of 17, and

16  because this defendant has a criminal history category of I,

17  the guideline range is once again found to be 24 to 30 months.

18       I will hear recommendations for re-sentencing at this

19  stage first from the government, Ms. Walters.

03:28PM 20  MS. WALTERS:  Your Honor, and I'll be brief, our

21  recommendation is that you impose the 30-month sentence that

22  you imposed previously for all the reasons that you had set

23  forth on the record at Mr. Prange's previous sentencing.

24       THE COURT:  All right.  Mr. Fuller.

25       MR. FULLER:  Your Honor, we continue to believe that

1    the appropriate sentence is at the low end of the guidelines,

2    and if the guideline calculation is 24 to 30, we would ask that

3    Mr. Prange be sentenced to 24 months rather than the 30-month

4    at the high end of the guideline.

5         All the other defendants in the case have been

6    essentially sentenced at the low end of the guidelines and that

7    the enhancement that's given on the two points for Mr. Prange

8    increase the sentencing anyways in that a 24-month sentence is

9    more than sufficient and punitive to prevent any recurrence.

03:28PM 10         THE COURT:  Let me inquire of the government as to why

11    it believes that the high end of the guideline is appropriate

12    here.

13         MS. WALTERS:  One of the reasons that I believe the

14    Court took into account previously and I think is relevant here

15    and it was established at trial is Mr. Prange's conduct when

16    the officers arrived to arrest him, and that when he was --

17    when somebody knocked on the door, they announced themselves,

18    it took the officers a great deal of time to find him, and he

19    was found hiding in a closet, so the flight is relevant.

03:29PM 20         Mr. Prange, as the Court is aware and heard at trial,

21    has had a sort of history in the securities markets.  The

22    Wisconsin Securities Commission was investigating him for some

23    time, and so his conduct, while it doesn't give rise to any

24    increase in criminal history, the nature and characteristics of

25    this particular defendant warrant the 30-month sentence.

1          Also, as your Honor just noted in revisiting the issue

2     of loss, this is a conservative measure of loss here.  The

3     defendant's own expert identified the fact that there could be

4     an argument that the intended loss was much greater.

5          As Mr. Fuller pointed out in his argument, Mr. Prange

6     sitting there that day thought he was sitting across from a

7     real corrupt hedge fund manager who was willing to steal

8     millions and millions of dollars from his fund, and, in fact,

9     that was Mr. Prange's intent.

03:30PM 10          For all of those reasons, the guidelines calculation

11     is reasonable, if not conservative, and a sentence at the high

12     end of the guidelines is appropriate.

13          THE COURT:  Thank you, Ms. Walters.

14          Does the defendant wish to address the Court before he

15     is re-sentenced on this offense?  Mr. Prange.

16          THE DEFENDANT:  Hello, your Honor.  Can you hear me?

17          THE COURT:  Yes, I can.

18          THE DEFENDANT:  Given that I really haven't chatted

19     with my counsel and I recognize and respect what you have said,

03:31PM 20     sir, I certainly would ask for, you know, my counsel, who's

21     given me very excellent representation throughout this case to

22     be supportive of my, you know, my desire, of course, to be at

23     the end of the guideline that he's trying to speak with you

24     about, so I would ask if you could just speak with Mr. Fuller

25     once more.

1    THE COURT:  All right.  I don't know whether he's

2    asking you to make a further argument, Mr. Fuller, but I'll

3    give you the opportunity.

4    MR. FULLER:  I would only note a couple of responses

5    to the government's position.  With respect to Mr. Prange's

6    conduct at the arrest, you'll recall that the evidence was that

7    there were multiple sheriffs and marshals that showed up with

8    guns drawn at the house at the break of dawn, and that that

9    itself was a terrifying event for Mr. Prange, but irrespective

03:32PM 10   of that, it's conduct that occurred afterwards, after the

11   offense and had nothing to do with the offense itself.

12        2, while they report to an assorted history in the

13   securities industry, the evidence at trial suggested no such

14   thing.  He had a completely clean U-4, he's never had any

15   customer arbitrations, he's never been sued over a securities

16   fraud matter.

17        There was never a civil securities fraud brought by

18   the State of Wisconsin.  In fact, what the evidence would show

19   had we had the opportunity to put it in if we knew it was

03:32PM 20   relevant was that he actually worked with the securities

21   commissioners and taught courses with them during his

22   professional efforts raising capital for a number of Wisconsin

23   companies, so, 1, there was never any criminal charges; 2, he

24   was never charged with perjury or any enforcement action by the

25   State of Wisconsin, so I think that that's a little bit of a

1    red herring there, the fact that they happened to get a

2    customer complaint from an individual company that he had sued

3    and later ended up paying him a large sum of money to resolve

4    that suit suggests that there was no merit to the claims that

5    he had engaged in any wrongdoing in the State of Wisconsin in

6    the securities industry.

7         James Prange has been in prison now for 14 months, I

8    believe, and is looking at a substantial amount of time in

9    prison for this offense, and while we accept the jury's

03:33PM 10   verdict, I think that the appropriate punishment to prevent

11   anything from recurring and to send the proper message is more

12   than duly served by a 24-month sentence.

13        THE COURT:  Thank you, Mr. Fuller.  Do counsel know of

14   any reason why sentence ought not to be re-imposed at this

15   stage?

16        MS. WALTERS:  The government is not aware of anything,

17   your Honor.

18        THE COURT:  Mr. Fuller.

19        MR. FULLER:  No, your Honor.

03:33PM 20   THE COURT:  All right.  Then I am going to reimpose

21   the same sentence that I imposed before, Mr. Prange, because I

22   do not believe anything has changed.  I believe the

23   First Circuit properly sent this matter back to make sure that

24   it understands my finding as to the loss that was incurred in

25   this case and to make sure that it was explained fully on the

1    record.

2            I have done that by considering both your expert's

3    report and the government's expert report, but I come out

4    understanding and agreeing with the government's way of

5    determining the loss rather than the way that is promoted by

6    the expert that was appointed on your behalf.

7            So, therefore, pursuant to the Sentencing Reform Act

8    of 1984 and having considered the sentencing factors enumerated

9    in Title 18 of the United States Code, Section 3553(a), it is

03:35PM 10   the judgment of this Court that you, James Prange, are hereby

11   committed to the custody of the Bureau of Prisons to be

12   imprisoned for a term of 30 months.  This term consists of

13   terms of 30 months on each count, all to be served

14   concurrently.

15           Upon release from imprisonment, you shall be placed on

16   supervised release for a term of two years.  This terms

17   consists of terms of two years on each count of conviction, all

18   such terms to run concurrently.

19           Within 72 hours of release from custody of the Bureau

03:35PM 20   of Prisons, you shall report in person to the district to which

21   you are released.  I notice that I originally imposed a fine of

22   $20,000, but I believe that was subsequently reduced to

23   $15,250.  Is that correct, Mr. Fuller?

24           MR. FULLER:  I believe that is correct, your Honor.

25           THE COURT:  All right.  And it is further ordered that

1    the defendant shall pay a fine of $15,250, and it is further

2    ordered that the fine imposed is to be continued to be paid

3    until the full amount, including any interest required by law

4    is paid.

5          All fine payments shall be made to the clerk of the

6    United States District Court, and you are to notify the

7    United States Attorney for this district within 30 days of a

8    change of mailing or residence address that occurs while any

9    portion of the fine remains unpaid.

03:36PM 10          Is it the government's position that I need to repeat

11    and reimpose all of the conditions of supervised release at

12    this time?

13          MS. WALTERS:  No, your Honor, I think if you just

14    incorporate the ones in the previous sentencing, that would be

15    fine.

16          THE COURT:  The conditions of supervised release as

17    initially imposed at the time of the original sentencing in

18    September of 2012; is that when it was?

19          MS. WALTERS:  2013, your Honor.

03:37PM 20          THE COURT:  September of 2013 are reimposed as they

21    were set forth in the sentencing and the judgment and committal

22    submitted at that time.

23          Is there any further business to come before the Court

24    in these proceedings, Ms. Walters?

25          MS. WALTERS:  Nothing from the government.

1          THE COURT:  Mr. Fuller?

2          MR. FULLER:  Nothing, your Honor, other than with

3    respect to the fine, to the extent some of it has already been

4    paid or all of it has been paid, I'm assuming this isn't

5    duplicative?

6          THE COURT:  Of course, this is a one-time fine.  To

7    the extent that it has been paid, obviously it doesn't need to

8    be repaid.  To the extent that any portion of that $15,250

9    remains unpaid, it is still due and owing.

03:37PM 10          All right.  We're adjourned.

11          MR. FULLER:  Thank you, your Honor.

12          (Whereupon, the hearing was adjourned at

13    3:37 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7

8          I do hereby certify that the foregoing

9    transcript, Pages 1 through 23 inclusive, was recorded by

10   me stenographically at the time and place aforesaid in

11   Criminal Action No. 11-10415-NMG, UNITED STATES of AMERICA

12   vs. JAMES PRANGE and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15          Dated this 10th day of April, 2015.

16

17                  s/s Valerie A. O'Hara

18          _____

19             VALERIE A. O'HARA

20             OFFICIAL COURT REPORTER

21

22

23

24

25